## Case No. 12,582.

SEAMAN v. ERIE RY. CO.

[2 Ben. 128.] [1]

District Court, E. D. New York. Jan., 1868.

SALVAGE—ICE—COMMON CARRIER—LIABILITY OF OWNERS FOR SALVAGE OF CARGO.

1. Where a railway company received freight in New York, which must be carried to New Jersey to be put on the railroad trains, and had made a contract with one A. to carry such freight from a dock in the East river to the

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

station in Jersey City, A. agreeing to assume the risk of the transportation across the river, and a barge belonging to the company, loaded with such freight, was transporting it across the river, under the direction of A. or his employees, the barge, with another barge, being towed by a steamboat, and the hawser parted, and the one barge was left to drift, while the steamboat took care of the other; and while she was so drifting, a large field of ice came up the river, and carried her along with it in such a direction that the barge was in imminent danger of being crushed between the ice and a pier above, and thereupon a steamtug, on the call of those on board the barge, went to her, and pulled her out of the ice, and got her into one of the slips, till the field drifted by, the value of the barge and cargo being from $30,000 to $45,000, and of the tug $10,000, and the service occupying about half an hour, *held*, that the service was a salvage service.

2. The railway company were personally liable for the salvage.

3. $500 was a reasonable salvage, besides $50 for injury to a hawser.

[This was a libel for salvage by Lawrence Seaman against the Erie Railway Company.]

John F. Baker, for libellant.

Eaton, Tailer & Newell, for respondents.

BENEDICT. District Judge. This is an action in personam to recover salvage compensation for services performed by the steamtug J. S. Underhill, in this port, in rescuing the barge H. Suydam and her cargo from the ice. The evidence discloses the following state of facts:

On the 23d of January, 1867, the steamtug Van Houghten, while engaged in towing two barges in the East river, parted her hawser, and was compelled to leave one of them, the H. Suydam, adrift, while she towed the other into a pier. While the Suydam was so adrift, and while the Van Houghten was engaged in landing the other barge at the pier, a large field of ice came into the East river upon the flood tide, which caught the Suydam, and carried her along with it up the river, the barge lying at right angles to the shore, with her stern to the New York side, and her bow imbedded in ice. The river narrows above the South ferry, and the flood tide sets over to the New York shore, so that the floe as it moved up was constantly approaching the New York piers, and when off pier 9 was from one hundred to three hundred feet from the piers. It was, moreover, large enough to fill the river in the narrow part above, and so firm that later in the day numbers of persons crossed the river upon it, after it had jammed in at the Fulton ferry. The Underhill was lying at pier 9, and as the barge was carried by her, the master of the Underhill hailed those on board of the barge, and called attention to their danger. No answer was immediately returned, but shortly those on the barge hailed the Underhill to come to their aid. The Underhill at once pushed out, backed down to the barge, threw her a line, pulled her out of the ice, and started with her for the slips. By this time the vessels had been carried up as far as pier 16, the upper pier of the Wall Street fer-

ry slip. On reaching the piers, the tug swung the barge into the slip above the ferry, and herself into the ferry slip, the ice being then close upon the vessels, and in fact pushing against the tug as she moved into the slip. So placed, with her hawser still fast to the barge, but around the end of pier 16, the tug held the barge until the ice moved off, when she took her to her destination at Jersey City, no injury having been sustained by either vessel, except the chafing of the hawser by the strain around the pier.

These facts present all the elements of a salvage service. That there was imminent danger of great damage, if not of the total loss of the barge and her cargo, can hardly be doubted. Upon the whole evidence, no other means of rescue was at hand but the Underhill, although there is some testimony going to show that the Van Houghten could have reached the barge, and would have rescued her, had not the Underhill gone out. The Van Houghten, it is true, was coming up the river, in hopes to get hold of the barge, but the evidence shows that the ice was closing on the piers so fast that she herself was compelled to take refuge in the ferry slip, and was already there when the Underhill got in; and if the Van Houghten could have reached the barge under the circumstances, all she could have done was to have passed up the river, and by casting a line to the barge endeavored to tow her up the river ahead of the ice before it should shut in. But a large part of the floe was already above the barge; and upon the evidence, I consider the success of such an attempt, had it been made, as extremely doubtful. So it must have appeared to the men on the barge, for they saw the Van Houghten coming up, and heard the hail of the Underhill as they passed her, but called only when it was apparent that the Van Houghten could not reach them in time. The service rendered was not without risk to the Underhill, for the floe was heavy ice, extending to the Brooklyn shore, and had it caught the tug against a pier, she could not have escaped without serious damage. She had barely time to save herself, without any allowance for accident or misjudgment.

The aid thus furnished was voluntary; it was rendered promptly, and resulted in success. Such a service the maritime law, out of considerations of public policy, is careful to reward with liberality. As bearing upon the question of the amount proper to be awarded in this case, it is worthy of remark, and, under the circumstances, of commendation, that the master of the tug, while he watched the barge, and in time called her attention to her danger, did not obtrude his services, but allowed the persons on the barge to decide as to the possibility of being rescued by their own tug; and when called, although no other aid was present, he made no attempt to make a hard bargain, but, relying upon the maritime law to give him due compensation in case of success, at once assumed the risk.

The value of the tug was about $10,000; the value of the barge and cargo from $30,000 to $45,000. The time occupied, however, did not exceed thirty minutes, not including the time used in taking the barge to the railway dock in Jersey City. No loss of business or injury to property was sustained beyond the chafing of the hawser. The ordinary price charged by tugs about the harbor on this day was $15 per hour. In view of all these circumstances, I deem $500 a proper reward, to which I add $50 for the damage to the hawser.

A remaining question in the case is, whether the defendants, the Erie Railway Company, can be held personally liable for this amount, in an action in personam. The facts material to the disposal of this question are not in dispute. It appears that the barge belonged to the Erie Railway Company, and was laden with merchandise which had been delivered to that company in New York City, to be transported by them West.

Being common carriers by land, the exception of perils of the seas formed no part of the contract between the railway company and the shippers of the goods. The trains of this railway start from the railway dock at Jersey City, but the company have a station for the receipt of freights at the East river, in New York City, and by a general contract made between them and one Archer, the latter for a consideration paid him by the railway company, had agreed to provide suitable conveniences for, and to receive all freight offered at the East River station, for the West via the railway, and to deliver such freight at the railway dock in Jersey City, Archer also agreeing to assume all the risk of the transportation across the river. This barge, when she was caught in the ice, was transporting her cargo to Jersey City, under the direction of Archer or his employees, in pursuance of this contract. I see nothing in these facts to relieve the railway company from liability for this salvage. The nineteenth rule of the supreme court gives the right to proceed in personam for salvage against the party at whose request and for whose benefit the service is performed. That party, in this case, was the Erie Railway Company, for they were the owners of the barge, and held the relation of carriers to the merchandise on board. In case loss or damage had occurred to the merchandise by the ice, the railway company would have been personally liable to the owners of the merchandise, and that liability they escaped through the services of this salvor. Moreover, the libellants had a lien upon the barge and her cargo for this salvage, which they could have enforced, and which, had it been enforced, the defendants would have been compelled to discharge. Having received this property from the hand of the salvor, they thereby became liable to pay the amount of the lien. The Emblem [Case No. 4,434]. The maritime law, while it is careful to secure to salvors their compensation, by giving them a

lien upon the property saved, does not compel them in all cases to proceed against the property to secure the benefits of the lien. Such a rule would cause unnecessary expense, and in many cases serious embarrassment to commerce, to avoid which the salvor is permitted to surrender the property to its owner, and to the extent of its value hold him personally liable for a proper salvage compensation for the benefit received.

A decree must accordingly be entered in favor of the libellant for the sum of $550, with costs.